1
2
3
4
5
6
7
8
9

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

10  JAMIE HURLEY,                          Case No. CV12-5688 DSF (OPx)

11            Plaintiff,               **FINDINGS OF FACT AND**
                                       **CONCLUSIONS OF LAW AFTER**
12        v.                           **COURT TRIAL**

13  LOMA LINDA UNIVERSITY
    MEDICAL CENTER and PATRICK
14  CASEY,

15            Defendants.

16

17

18

19         This case having come on for trial without a jury, and the Court having

20  heard live testimony and having duly considered the evidence, the credibility of the

21  witnesses, the entire file of the Court, and the contentions and arguments of

    counsel, the Court makes the following findings of fact and conclusions of law in

22  accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

23

24                          **FINDINGS OF FACT** [1]

25

26

27         [1]  The Court has adopted certain findings of fact and conclusions of law from the

28  proposed findings and conclusions of both parties.  Any different or additional proposed
    findings or conclusions were either unsupported or unnecessary to the Court's

1.  Plaintiff Jamie Hurley is an individual with a disability protected within the meaning of federal and state disability law.  (Final Pretrial Conference Order (FPCO), Docket No. 44, at 2.)

2.  On December 30, 2011, Hurley, her brother Cody Hurley,[2] and her step-grandmother Muriel Jane Madrid[3] attempted to visit Hurley's grandfather, who was a patient at the Loma Linda University Medical Center (Hospital) and was not expected to live much longer.  (Reporter's Transcript, September 26, 2013 (RT1), 10:1-12, 55:21-56:1.)

3. The Hospital is owned, leased, or operated as a place of public accommodation within the meaning of federal and state civil rights laws protecting persons with disabilities, (FPCO at 3), and receives federal funding in its operation, (Stipulation of the Parties, Docket No. 45).

4.  Hurley had with her a service dog that was individually trained to provide assistance to her as an individual with a disability.  (FPCO 2.)  Hurley's service dog was wearing a red harness vest with "Service Dog" on both sides.  (RT1, 10:13-11:25, Ex. 1.)

5.  In the vest, there was a laminated pouch containing a card that stated:

USA FEDERAL LAW.  The Handler of this Service Animal has Voluntarily presented this ID.  The Disabled Handler is NOT REQUIRED by Law to do so under the Federal ADA Act or the US FAA & DOT.  This Service Animal and their access to ALL public places and commercial carriers is protected under Federal Law.  For questions concerning the ADA, please contact the US Department of Justice . . . .

---

determination.

[2]  To avoid confusion, the Court refers to Mr. Hurley as "Cody," rather than Hurley.

[3]  Madrid is the ex-wife of Hurley's grandfather.  (RT1, 55:17-18.)

1

(Ex. 2.)[4]

6. Hurley's service dog had attached to her vest a plastic hanging tag denoting her license number as a service dog registered in California. (RT1, 10:22-11:1.)

7. No one attempted to stop Hurley on her way to her grandfather's room or to inquire about the dog, nor had anyone done so on her prior visits to the Hospital. (RT1, 33:7-12.)

8. When Hurley, her service dog, Cody, and Madrid arrived, Kathy, Hurley's biological mother,[5] was visiting Hurley's grandfather. Hurley and Cody are estranged from Kathy, (RT1, 34:23-35:17, 56:11-18; Ex. 35, Decl. of Cody Hurley (Cody Decl.) ¶ 4), and did not want Kathy in the room while they were visiting their grandfather, (RT1, 34:5-15).

9. Though Hurley generally denied that she had any animosity toward Kathy, (RT1 35:4-17), it was clear from the demeanor and manner of both Hurley and Madrid while testifying that Kathy's presence created significant stress and tension. At trial, Hurley seemed to think that Kathy had been removed from her grandfather's room (perhaps before Hurley and her party arrived), (RT1, 34:8-10), but there was no evidence to that effect. Hurley was also clearly upset that her grandfather had given money to Kathy in the past, (RT1, 37:9-11), and she had been concerned that Kathy was exerting undue influence over him while he was hospitalized, (RT1, 37:4-21). Part of the reason they all went to the Hospital was to be sure that Kathy could not do so. (Id.) There was clearly significant

---

[4] It is not clear to the Court what is meant by the statement: "The Handler of this Service Animal has voluntarily presented this ID." There was no "ID" presented to anyone during this incident.

[5] Hurley's biological mother was identified only as "Kathy." For that reason, the Court refers to her by her first name.

2

animosity towards Kathy, whom Madrid described to the nurses as "a multi-felon," who is "on parole."  (RT1, 56:24-25.)

10.  The specific circumstances surrounding the dispute concerning visitation are not clear.  Memories have faded, each witness had a different perspective, and there are understandable differences and inconsistencies in the testimony.  The Court need not determine who – if anyone – was at fault, though clearly Hurley, Cody, and Madrid believed they had a right to visit with Hurley's grandfather – and to have Kathy leave the room while they did so.

11.  The animosity against Kathy was so intense that even though all three were distressed over Casey's alleged  conduct, as described later in these Findings, and Hurley was recovering from a panic attack, the conversation in the car as they were leaving the Hospital turned to the topic of why the Hospital had not addressed the issue that they had initiated – that Kathy was on parole, and "who knows if she was legally on parole."  (RT1, 64:6-12.)

12.  Hurley, Cody, and Madrid all requested that the nurses contact security to remove Kathy from the patient room so they could visit with Hurley's grandfather alone.  (RT1, 12:11-25, 56:19-57:5; Ex. 29, Deposition of Cody Hurley (Cody Depo.), 8:10-15.)  It appears they believed the nurses were contacting security to assist them in removing Kathy from the patient room, but the evidence establishes the nurses simply reported a family dispute.  (E.g., RT1, 76:4-24, 97:7-13.)  In any event, the nurses contacted security and several security officers soon arrived at the scene, including Patrick Casey.  (RT1, 76:4-24, 97:7-13; Ex. 37, Molly Mesipam Resp. to Special Interrogs. 2-3.)

13.  The Court can not – and need not – determine exactly where each family member was at the time the officers arrived.  Officer Michael Taylor asked the visitors in the room to leave so that Taylor could speak to the patient alone.  Taylor asked Hurley's grandfather if he wanted Kathy to visit him and Hurley's grandfather said yes.  (RT1, 77:8-78:24.)

14.   As the security officers were attempting to resolve the dispute, Hurley raised her voice and angrily stated to Kathy something to the effect of: "I am the way I am because of you." (RT1, 81:9-16, 98:21-99:13, 119:17-25.) She may also have used obscenities. (RT 1, 99:2-3.)

15.   Casey then approached Hurley. (RT1, 99:12-22.) In response to the remark Hurley made to Kathy, Casey told Hurley that this type of behavior would not be tolerated and that visitation at the Hospital was a privilege, not a right. (RT1, 100:20-101:2, 120:22-121:3.)

16.   Casey had doubts about whether Hurley's dog was indeed a service dog. It did not appear to Casey that the dog was performing any specific tasks and Hurley did not appear to him to be disabled. (RT1, 121:12-15.) (Hurley does not contend that the dog was performing any tasks at the time, nor does she contend that her disability was obvious.)

17.   Before working for the Hospital as a security officer, Casey had been employed as a deputy sheriff with San Bernardino County from 1983 until 2001. (RT1, 114:15-23.) He had experience with people falsely claiming to have service animals, and wanted to be sure that a crime wasn't being committed in his presence. (RT1, 126: 4-14.) He also knew people could buy vests at Target or Wal-Mart and on eBay. (RT1, 116:10-19.) Based on his experience as a deputy sheriff, he believed that he could ask individuals to provide documentation regarding service animals. (RT1, 115:8-14, 140:10-12.)

18.   Casey began inquiring about Hurley's service dog. (RT1, 121:10-11.) Casey first asked whether the dog was a service dog, and Hurley responded that it was. (RT1, 121:24-122:3.) Casey then asked whether Hurley had documentation that would show that the dog was a licensed service animal. (RT1, 122:4-6.)

19.   Hurley became loud, angry, and emotional when Casey began asking for documentation. (RT1, 69:15-22, 102:15-103:5; Cody Depo., 9:6-21.) Hurley told Casey that she did not have to show Casey any paperwork. (RT1, 13:4-12, 102:15-20, 122:11-21.) This began a back-and-forth, with Casey eventually asking Hurley

for documentation for the service dog perhaps two or three times. (RT1, 133:22-24.)

20. Throughout the argument, Hurley raised her voice, used profanity, and became confrontational and hysterical. (RT1, 82:1-24, 103:13-24, 122:18-123:11.) She was agitated and belligerent. (Ex. 37, Molly Mesipam Resp. to Special Interrogs. 2.) Cody was afraid Hurley might hit Casey. (Cody Depo., 20:5-13.) He attempted to "soften" his testimony in his later filed declaration, (Cody Decl., ¶12), but the Court finds his deposition testimony more reflective of Hurley's demeanor and Cody's observations of her conduct. At certain points, Hurley was practically screaming. (RT1, 82:7-10.) Her voice could be heard from at least 25 feet away. (RT1, 80:21- 81:6.)

21. Hurley's reaction – even as described by her own witnesses – was totally inappropriate and certainly constituted grounds for Hurley to be asked to leave – or to be removed from – the Hospital. There was no testimony or other evidence that Hurley's reaction was in any way related to her post-traumatic stress disorder (PTSD). None of her conduct falls within the signs or symptoms of PTSD testified to by Hurley or the expert witnesses.[6]

22. Hurley testified that she informed Casey that she suffered from PTSD, and that she was on disability and could not work. (RT1, 14:12-20.) She testified that she told him anything she could think of to get him to leave her alone. (Id.) Casey testified that Hurley did not provide any of this information. (RT1, 131:25-132:6.) Madrid and Officer Nassar testified that Hurley told Casey she suffered from anxiety. (RT1, 61:2-5, 108:8-20.) The Court need not resolve this dispute.

23. Despite apparently being willing to provide Casey with these intimate details, Hurley did not at that time refer him to the information on the dog's vest or

---

[6] Hurley alleges in her Complaint that she advised Casey that her panic attack caused her to speak loudly. (Compl. ¶ 51.) She submitted no evidence to support this allegation. In any event, the aggressive and belligerent behavior that caused her to be told to leave the Hospital occurred before the panic attack began.

the registration documentation,[7] or point out to him that the dog had a California license – nor was she required to do so.

24.   Although Hurley and Cody testified that Casey touched Hurley's nose during the confrontation, (RT1, 15:7-9, Cody Depo. 14:7-10), the Court is persuaded by the evidence that Casey – at most – pointed his finger at Hurley while they were face to face, (see RT1, 82:3-6, 134:23-135:3).  Even Madrid testified, "his finger was just about ready to touch her face."  (RT1, 59:24-25.)  The Court finds that Casey never intended to touch Hurley or to cause any harmful or offensive contact with Hurley.

25.   Casey informed Hurley that if she did not cooperate, he would have to call the police and have her arrested for disturbing the peace and trespassing. (RT1, 15:4-5, 123:14-20.)  He also informed her that if she were arrested, her dog would likely be put "in the pound."  (RT1, 15:7-9, 124:7-12.)

26.   Hurley continued to be disruptive, and Casey told her to leave the Hospital.  (RT1, 14:6-8, 123:6-11, 136:15-22.)

27.   After Casey told Hurley to leave, Hurley suffered a panic attack.  (RT1, 14:6-23, 104:6-8.)  She broke down, began hyperventilating, and was on the floor crying.  (RT1, 59:9-17, 89:4-13, 111:15-20.)

28.   Hurley eventually agreed to leave the Hospital.  Madrid and Cody picked her up and carried her down to the first floor of the Hospital where staff brought her a wheelchair to exit the Hospital.  (RT1, 63:20-23, 84:17-25.)

29. Hurley had driven Cody and Madrid to the Hospital that day but she was not able to drive home.  Cody drove the three of them home in Hurley's car.  (RT1, 17:17-22, 63:24-64:1.)

---

[7]  It is not clear to the Court whether Hurley had such documentation, or if she did, why she would not have provided it.  The language on the vest ("The Handler of this Service Animal has Voluntarily presented this ID.") seems to indicate that she carried documentation for that very purpose.  Because Casey's inquiries were legally impermissible, the Court need not decide the issue.

30.  Having carefully considered the sequence of events, and the conduct of the various parties, the Court finds that Casey violated the law by inquiring about documentation for Hurley's service dog.  Hurley was already stressed and angry over the fact that Kathy was visiting Hurley's grandfather.  This caused her to react inappropriately when questioned by Casey.  Although Hurley overreacted to Casey's unlawful inquiry, the Court finds that Hurley was ultimately told to leave the Hospital because of her disruptive conduct,[8] which was not related to her disability.

31.  Hurley had been diagnosed with PTSD when she was seven years old. (RT1, 26:7-12.)  She has seen a number of psychiatrists and has taken psychiatric medications since she was a teenager.  (RT1, 27:5-10.)

32.  For some time prior to the incident on December 30, 2011, Hurley had been seeing only Dr. Robert Krochmal, "a holistic medicine physician," for about a year, and was taking Ketamine as part of a trial.  (RT1, 27:11-20.)  Prior to the incident, Hurley reported to Krochmal that she was "anxious all the time, overwhelmed, had panic attacks, [and] would cry automatically if [she was] confronted with authority."  (RT1, 27:21-25.)   In June 2011, Hurley told Krochmal that her panic attacks were increasing, were very, very debilitating, were

---

[8]  Hurley herself testified that she believed she was being required to leave the Hospital because of what her grandmother said, not because of her dog.  (RT1, 15:1-6.) Madrid's testimony was somewhat inconsistent on this and other issues, impacting her credibility – or at least her memory and perception.  She admitted to having cognitive and memory problems.  (RT1, 67:4-13.)  Madrid testified that Casey asked Hurley to leave "[b]ecause he didn't like the way she was behaving."  (RT1, 62:1-3.)  The defense objected to the question and the objection was sustained.  Madrid then was asked "What did you hear the security officer say was the reason for asking Ms. Hurley to leave?" and Madrid responded: "[I]t's hard to say."  (RT1, 62:4-10.)  Her later testimony on the issue was even more evasive, but she eventually admitted Hurley was told she could return the next day after she calmed down.  (RT1, 67:14-70:2.)  Casey, Taylor, and Nassar all testified that Hurley was asked to leave because of her disruptive conduct.  (RT1, 123:6-11; 89:18-22, 104:10-14.)  And according to one of the nurses on duty at the time, Hurley was asked to leave due to her "shouting and hysterical behavior."  (Ex. E, Decl. of Evelyn Castelo ¶ 2.)

interfering with her activities of daily living, and that she was having intractable depression and anxiety with frequent panic attacks.  (RT1, 28:3-12.)

33.  Krochmal's Progress Notes show a visit on September 20, 2011 – but none again until February 23, 2012, nearly two months after the incident.  (Ex. 26.)  There is no indication in the February 23 Progress Notes that Hurley even mentioned the December 30 incident, any increased anxiety, or other exacerbated symptoms.  (Id., 2/23/12 Progress Notes; Reporter's Transcript, September 27, 2013 (RT2), 122:20-25.)  Krochmal admitted that his memory was "refreshed" about statements made to him by Hurley through a conversation with Hurley's counsel and a recent visit (recent to the time of trial) with Hurley.  (RT 2, 123:1-17.)  Based on the Court's observations at trial and its review of the level of detail in Exhibit 26, the Court gives little credence to Krochmal's explanation of why there are no references in his Progress Notes to Hurley's alleged emotional retelling of the incident at the Hospital.  (RT 2, 129:7-131:21.)

34.  On February 23, Hurley truthfully reported to Krochmal that the Ketamine had significantly helped with her anxiety and panic attacks.  (RT1, 28:16-21.)  By March 2012, Hurley reported that for the first time in ten months (in other words, since June 2011), she was starting to feel normal again.  (Ex. 26, 3/12/12 Progress Notes.)  Hurley testified that the Diflucan she was taking was helping a lot and that she was sleeping better.  (Id., RT1, 28:25-29:3.)  She also told Krochmal that her panic attacks had gone away.  (Ex. 26, 3/12/12 Progress Notes.)  At trial she testified she meant that there was significant improvement.  (RT1, 29:4-5.)  In addition, the Ketamine took away a little of her baseline anxiety, and permanently rid her of the "automatic crying."  (RT1, 29:18-25.)

35.  Despite the lack of any reference to the incident in his notes, and the self-reported improvement in her condition, Krochmal testified that Hurley's prognosis suffered as a result of the incident.  (RT2, 116:7-11.)  He opined that this harm could be addressed through as few as five to ten, and up to 20, treatment sessions.  (RT2, 119:10-120:17.)  Although the Court agrees that Hurley suffered

8

some negative effects from the incident, the Court finds, based on the evidence, that Krochmal's lower estimate of five sessions is the most that will be needed (or effective) to treat those effects.

36.   Dr. Stephen Trudeau, the clinical psychologist who treated Hurley soon after the incident, testified that he did not believe that Hurley suffered from PTSD before this incident.  (RT2, 12:23-13:5).[9]  This testimony is contrary to the stipulation of the parties, and the testimony of both Hurley's treating physician and the defense expert.  Moreover, before the incident, Trudeau had not seen Hurley since she was a teenager.  (RT2, 13:15-14:6.)  Hurley's counsel also failed to lay a proper foundation for much of Trudeau's testimony.  For these and other reasons, the Court discounts entirely the testimony of Trudeau.  The Court therefore gives no weight to Trudeau's opinion that Hurley will need to attend an inpatient residential treatment program or intensive outpatient treatment of 3-4 sessions per week as a result of the incident.  (RT2, 22:16-22, 29:3-15.)  Nor is this testimony consistent with that of Hurley's treating physician.

37.   The Court is persuaded by defense expert Dr. Ari Kalechstein's opinion that, while the incident was upsetting to Hurley and was distressing to her for a short period of time (days or weeks), it did not cause any long-term effects.   (RT2, 73:15-76:11.)  This is consistent with the progress shown in Krochmal's notes, and testified to (to some extent) by Krochmal.

38.   To the extent Hurley's condition may have worsened as a result of the incident, it did not worsen so much as to alter her course of treatment.  (RT2, 75:22-76:10.)  Hurley's primary symptoms relating to her diagnosis of PTSD – depression and panic attacks – were present both before and after the incident.  (RT1, 20:22-24; RT2, 33:17-34:5, 107:3-6; Cody Decl. 2:23-25.)

---

[9]  If the Court were to accept Trudeau's testimony as true, Hurley might not have been a person with a disability and presumably could not have properly brought a dog into the Hospital.

39.  During only approximately four of Hurley's visits with Krochmal (at a rate of $225 per visit)[10] was the incident even discussed.  In addition, Hurley attended ten sessions with Trudeau (at a rate of $20 per visit).  (RT2 9:20-25, 110:4-111:14.)  The Court finds that these visits, costing $1100, were appropriate in part due to the incident and in part due to Hurley's past diagnosis and symptoms.  (See, e.g., RT 2, 111:7-8.)

40.  Hurley was able to make progress with regard to her symptoms during these sessions.  (RT2, 109:6-11.)

41.  From January through October 2012, Hurley was seeing Trudeau for a number of emotional issues, including problems with her boyfriend,[11] her relationship with her (presumably adoptive) parents,[12] and generalized fear of panic attacks.  (RT1, 39:16-20).  Hurley stopped seeing Trudeau after October 2012 because it wasn't helping with "the exact issue," though she apparently started seeing him again at the time of trial.  (RT1, 38:21-39:12.)

42.  At the time of her deposition in May 2013, Hurley still was not seeing a psychologist or seeking psychological help or taking any medications.  (RT1, 39:21-40:17.)

43.  Hurley had started and dropped college classes on a number of occasions before December 2011.  (RT1, 30:1-3.)  The Court finds that Hurley's decision to drop classes at her community college and inability to concentrate on her schoolwork, (see RT1, 19:4-10), was not caused by the incident at the Hospital. Krochmal's Progress Notes for April 2, 2013 indicate Hurley is taking an art class

---

[10]  The burden is on Hurley to establish damages, and the specific number of visits relating to this incident was within the knowledge of both Hurley and her doctor. Nevertheless, the Court accepts Krochmal's estimate.

[11]  Cropley's testimony and observations are less persuasive than that of Kalechstein and Krochmal.  His testimony may also be colored by the fact that issues surrounding Hurleys' relationship with Cropley contributed to her anxiety.

[12]  Hurley suffered a great deal of physical and emotional distress in the home of her adoptive family.  (RT1, 26:23-25.)

10

and dropped her "vet class" because there was too much stress cramming for the test. She also revealed that she was having trouble with "reasonable accommodation" for an additional class. (Ex. 26, 4/2/13 Progress Notes.)  In fact, she was still in school and working on her finals in May-June 2012. (RT1, 30:10-23.)

44.  The Court finds Hurley's difficulty driving, (RT2, 21:3-8), other than on the day of the incident, was related to Hurley's previous symptoms and was not caused by the incident at the Hospital.  Although Hurley claimed she could not and can not drive, she drove herself to her visits with Trudeau.  In addition, Hurley asked Krochmal for Ketamine in April 2013 and was advised of the importance of not driving while taking Ketamine.  (Ex. 26, 4/2/13 Progress Notes.)

45.  At the time of trial, Hurley had been going to the Brain Treatment Center in Newport Beach for an unspecified period of time.  She did not describe the type of treatment she was receiving or whether she was being charged for the treatment.  (RT1, 40:21-41:41:6.)

46.  Though Hurley testified that to get back to where she was before the incident, she is "going to have to keep going to [her] doctors" and "seek out specialists," (RT1, 25:3-7), she has not presented sufficient evidence from which the Court could conclude that any continued treatment would be necessitated by the incident at issue in this case.  Nor has she provided any evidence from which the Court could calculate a non-speculative cost for such treatment.

47.  Hurley suffered from physical problems in mid-2012 which, according to what she related to Krochmal, made it hard for her to leave her home.  (Ex. 26, 8/6/12 Progress Notes.)

48.  Although Hurley presented testimony concerning a hospital stay allegedly related to this incident, Hurley was hospitalized due to abdominal pain.  While originally this was thought to be stress-related, and Hurley was stressed due to final exams and her impending psychological evaluation by the defense expert in

this case, the doctors apparently now have found a physical cause for this pain. (RT1, 50:17-19, Ex. 26, 1/31/13 Progress Notes.)

49.   The Hospital's conclusion that Hurley was asked to leave because she was being disruptive, rather than because she had an "undocumented" service animal, was appropriate.  In any event, the Court finds the Hospital's failure to resolve Hurley's internal complaint in her favor, (RT1, 22:21-25), did not cause Hurley any additional damages.  There was no medical or expert testimony to suggest otherwise and Hurley's testimony to the contrary was not persuasive.

50.   The Hospital had an operating policy in place on December 30, 2011 on the subject of service animals that expressly allowed all service animals access to the Hospital and additionally required the Hospital to make reasonable accommodations with regard to service animals if necessary.  (FPCO at 3; Ex. 32, 1-2.)

51.   The policy said nothing with regard to permissible or impermissible inquiries relating to the status of a service animal.  (Ex. 32, 1-2.)  Neither Casey nor the other security officers were provided training concerning service dogs, but they were aware at the time of the incident that service dogs were allowed into the Hospital.  (FPCO at 3.)

52.   Any finding of fact that constitutes a conclusion of law should be treated as such.

## CONCLUSIONS OF LAW

### A.    Vicarious Liability

53.   Casey and the other security officers are employees of the Hospital and were acting within the course and scope of their employment.  Therefore, the Hospital is vicariously liable for any unlawful conduct by the officers.  (FPCO at 2.)[13]

---

[13]  Hurley has not named the other officers as defendants.

**B.     Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, 12181** *et seq.*

54.   The Hospital was subject to Title III of the ADA at all relevant times, including December 30, 2011, because it is a place of public accommodation under the ADA.  42 U.S.C. § 12181(7)(F).

55.   Title III of the ADA prohibits discrimination based on disability by places of public accommodation:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to) or operates a place of public accommodation.

42 U.S.C. § 12182(a).

56. Discrimination includes:

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii).

57.   Congress directed the Attorney General to issue regulations implementing Title III.  42 U.S.C. § 12186(b).

58.   The regulations define a service animal as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability."  28 C.F.R. § 36.104.  The parties have stipulated that Hurley's dog was in fact a service dog and that Hurley is disabled.  (FPCO at 2.)

59.   28 C.F.R. § 36.302(c)(1) establishes a general requirement that places of public accommodation "shall modify policies . . . to permit the use of a service animal."  Within that general requirement is a prohibition on certain "inquiries" that can be made regarding a service animal:

> A public accommodation shall not ask about the nature or extent of a person's disability, but may make two inquiries to determine whether an

animal qualifies as a service animal. A public accommodation may ask if the animal is required because of a disability and what work or task the animal has been trained to perform. A public accommodation shall not require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal. Generally, a public accommodation may not make these inquiries about a service animal when it is readily apparent that an animal is trained to do work or perform tasks for an individual with a disability (e.g., the dog is observed guiding an individual who is blind or has low vision, pulling a person's wheelchair, or providing assistance with stability or balance to an individual with an observable mobility disability).

28 C.F.R. § 36.302(c)(6).

60. Casey violated this provision by repeatedly asking Hurley for documentation proving that her dog was indeed a service animal. Defendants argue that this regulation does not apply because Casey did not *require* documentation, but merely asked for it. This contention, however, is at odds with the evidence showing that Casey requested documentation perhaps two or three times. Casey admitted that he believed he could require that such documentation be provided. Moreover, the regulation prohibits all inquiries regarding the nature or extent of a person's disability other than the two exceptions specified above.

61. Defendants also argue that the last sentence of the provision permits Casey's actions because the dog's status as a service animal was not readily apparent. This reading of the provision is flawed, however, because that qualification clearly applies only to the two permitted inquiries. When read as a whole, the provision plainly prohibits all inquiries other than the two permitted inquiries, while also limiting the permitted inquiries to situations in which it is not readily apparent that the animal is a service animal.

62. Casey's inquiries clearly violated the ADA. The Court pauses to note that this regulation – intended to assist the disabled – often causes more harm than good. It is unsurprising that there is widespread fraud regarding service animals, as this regulation precludes law enforcement and personnel such as Casey from investigating whether purported service animals are what their owners say they are. See Sue Manning, Imposter Service Animals Posing Growing Problem, Associated

14

Press, Oct. 10, 2013; Phyllis W. Cheng & Mallory Sepler-King, <u>Clearing Up the Law on Service Animals</u>, L.A. Daily J., Dec. 3, 2013, at 5.  The resulting distrust of individuals with service animals, as Casey exhibited here, is rational – and only harms the truly disabled, such as Hurley.  Indeed, "knowingly and fraudulently representing [oneself] . . . to be the owner of [a] . . . service dog" is illegal in California, Cal. Penal Code § 365.7; but it is not clear how anyone is supposed to determine whether someone is violating the California law without violating the federal regulation.

63.  Casey did not retaliate against Hurley for "oppos[ing] any act or practice made unlawful by the Act" as prohibited by 42 U.S.C. § 12203(a).  Casey did not tell Hurley to leave the Hospital because of her assertion that it was unlawful for Casey to question her about the paperwork.  He told her to leave because of the manner in which she protested, not the fact that she protested.  Casey's actions resulted from Hurley's inappropriately loud, profane, aggressive, and disruptive behavior throughout their interaction.

### D.    Unruh Act, Cal. Civ. Code §§ 51, 52

64.  Casey also violated the Unruh Act, as "[a] violation of the right of any individual under the [ADA] shall also constitute a violation of this section."  Cal. Civ. Code § 51(f).

65.  In contrast to the ADA, <u>see</u> 42 U.S.C. § 2000a-3(A), civil damages are available for a violation of the Unruh Act.  Specifically, a defendant violating the Unruh Act "is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars."  Cal. Civ. Code § 52(a).

66.  The Court finds that the statutory damages of $4,000 are sufficient to compensate Hurley for any harm she suffered as a result of the violation.  Even assuming that all of the harm Hurley suffered as a result of the Hospital incident

was caused by Casey's improper inquiries,[14] the actual damages total less than $4,000. As the Court found above, Hurley has spent at most $1,100 for therapy sessions since the date of the incident – and these sessions addressed not only any harm Hurley may have suffered from the incident, but also Hurley's pre-existing condition and symptoms. And as the Court found above, no more than five future therapy sessions are necessary to treat any remaining issues stemming from the incident. At Krochmal's rate of $225 per session, this cost will be $1,125 at most. In fact, it is not at all clear that Hurley intends to participate in any further sessions. Hurley also seeks damages for emotional distress. The remainder of the statutory damages suffices to compensate Hurley for any other unquantifiable harm she has suffered.

67. Given Hurley's own behavior exacerbating the incident at the Hospital, the Court declines to exercise its discretion under Cal Civ. Code. § 52(a) to increase damages by up to three times the actual damages suffered.

### E.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a)

68. Section 504 of the Rehabilitation Act of 1973 states that no individual with a disability shall "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

69. The parties have stipulated that the Hospital receives federal financial assistance. (Stipulation of the Parties, Docket No. 45.)

---

[14] Although the Court need not reach this issue because of the statutory minimum, at least part of the harm Hurley suffered was due to Hurley's own bad behavior. Cf. Boemio v. Love's Rest., 954 F. Supp. 204, 209 (S.D. Cal. 1997) ("It is clear . . . that [plaintiff's] impatience . . . caused a portion of the anguish and the escalation of emotion in the proceedings on the evening in question. . . . The Court finds that reduction of the actual damages would be appropriate as a function of apportionment based on legal cause, however, the statutory minimum renders further analysis moot in this regard.").

16

70.  Because Hurley was subjected to disability discrimination under the ADA, she was also subjected to discrimination under Section 504.  See Vinson v. Thomas, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002) ("We examine cases construing claims under the ADA, as well as section 504 of the Rehabilitation Act, because there is no significant difference in the analysis of rights and obligations created by the two Acts.") (citation omitted).

71.  Damages are available only for intentional violations of the Rehabilitation Act.  Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001).  There is no evidence that Casey intentionally discriminated against Hurley because she was disabled, and the Court finds he did not do so.  Even assuming Casey had intentionally discriminated against Hurley, her damages are fully compensated by the Unruh Act's $4,000 statutory damage minimum, as described above.

### F.   California Disabled Persons Act, Cal. Civ. Code §§ 54, 54.1, 54.2, 54.3

72.  Defendants have violated the California Disabled Persons Act because "[a] violation of the right of an individual under the [ADA] also constitutes a violation of this section," Cal. Civ. Code § 54(c), and the Hospital is a medical facility open to the general public, see id. § 54.1(a)(1).

73.  Damages are not recoverable under both the Unruh Act and the California Disabled Persons Act, Cal Civ. Code § 54.3(c).  Hurley has elected not to recover damages under the Disabled Persons Act.  (See Pl.'s Post Trial Proposed Findings of Fact & Conclusions of Law, Docket No. 65, ¶ 243.)

### G.   Bane Act, Cal. Civ. Code § 52.1(b)

74.  The Bane Act provides as follows:

Any individual whose exercise or enjoyment of rights secured by . . . the laws of the United States, or of rights secured by . . . laws of this state, has been interfered with, or attempted to be interfered with, as described in subdivision (a) ["by threats, intimidation, or coercion" 52.1(a)], may

17

institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured.

Cal. Civ. Code § 52.1(b).

75. Hurley's federal and state civil rights were violated under the ADA, the Rehabilitation Act, the Unruh Act, and the California Disabled Persons Act, as described above.

76. However, Casey's violation of Hurley's rights stemmed from his inquiries about documentation of her dog's status as a service animal – not from threats, intimidation, or coercion. Although Casey asserted that Hurley's disruptive behavior and refusal to leave the premises could result in her arrest and in her dog's placement "in a pound," these statements were reasonable in response to Hurley's inappropriate and disruptive behavior. Casey's actions did not constitute threats, intimidation, or coercion. See Shoyoye v. Cnty. of Los Angeles, 203 Cal.App.4th 947, 959 (2012) (stating that only "deliberate or spiteful" violations of rights can constitute a Bane Act violation); see also McCue v. S. Fork Union Elementary Sch., 766 F. Supp. 2d 1003, 1011 (E.D. Cal. 2011) ("For the purposes of the Bane Act, the term threat means an expression of an intent to inflict evil, injury, or damage to another.") (citation and quotation marks omitted).

## H. Assault, Cal. Civ. Code § 43

77. The elements of a cause of action for assault are:

(1) defendant acted with intent to cause harmful or offensive contact, or threatened to touch plaintiff in a harmful or offensive manner; (2) plaintiff reasonably believed she was about to be touched in a harmful or offensive manner or it reasonably appeared to plaintiff that defendant was about to carry out the threat; (3) plaintiff did not consent to defendant's conduct; (4) plaintiff was harmed; and (5) defendant's conduct was a substantial factor in causing plaintiff's harm.

Yun Hee So v. Sook Ja Shin, 212 Cal.App.4th 652, 668-69 (2013).

78. Hurley's claim for assault fails because, as the Court found above, Casey never intended to touch Hurley or otherwise cause harmful or offensive

contact with her.  In any event, Hurley did not provide evidence of harm related to the alleged assault.

### I.      Battery, Cal. Civ. Code § 43

79.  The elements of a cause of action for battery are:

(1) defendant touched plaintiff . . . with the intent to harm or offend plaintiff; (2) plaintiff did not consent to the touching; (3) plaintiff was harmed or offended by defendant's conduct; and (4) a reasonable person in plaintiff's position would have been offended by the touching.

Yun Hee So, 212 Cal.App.4th at 669.

80.  Hurley's claim for battery also fails because, as the Court found, Casey never touched Hurley, nor did he intend to cause harmful or offensive contact with Hurley.

### J.      Intentional Infliction of Emotional Distress

81.  The elements of a cause of action for intentional infliction of emotional distress are:

(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

Davidson v. City of Westminster, 32 Cal. 3d 197, 209 (1982).

82.  Casey's actions were not extreme and outrageous, nor were they taken with the intent to cause emotional distress.  Hurley correctly points out that extreme and outrageous conduct may occur where a person of authority who knows the plaintiff is susceptible to injuries through mental distress intentionally takes actions with the recognition that those actions are likely to result in the plaintiff's emotional distress.  See McDaniel v. Gile, 230 Cal.App.3d 363, 372 (1991).  Here, however, Casey was not aware of Hurley's diagnosis of PTSD or her suffering of panic attacks until after he confronted her about the paperwork. Moreover, the confrontation escalated due to Hurley's disruptive behavior.  As the Court has found, Hurley's inappropriate and disruptive behavior was not related to her PTSD, and was not sufficient to put Casey on notice that she had PTSD, until she specifically advised him of that fact.  Casey's actions in response to that

escalation were reasonable, and they were not taken with the intent to cause Hurley emotional distress.

83.  Hurley's claim for intentional infliction of emotional distress therefore fails.

### K.      Negligence

84.  Under the doctrine of negligence per se, the failure of a person to exercise due care is presumed if he or she violated a statute or ordinance, if that violation proximately caused the plaintiff harm, if the resulting harm was of the nature that the statute was designed to prevent, and if the person suffering the injury is one of the class of persons for whose protection the statute or ordinance was adopted.  Cal. Evid. Code § 669(a).

85.  Casey violated the ADA, which prohibits the inquiries Casey made at the Hospital regarding paperwork for Hurley's dog.  As described above, that violation caused Hurley injuries in the form of emotional distress.  Emotional distress stemming from improper inquiries is likely the primary – if not the only – harm this provision was intended to prevent.  Hurley, as an individual with a disability, is within the class of persons the statute was designed to protect.  Hurley has therefore established a claim for negligence per se.

86.  As described above, Hurley's damages are fully compensated through the Unruh Act's $4,000 statutory minimum.

### L.      Negligent Training/Supervision, Cal. Civ. Code § 1714(a), 3333

87.  Although the Hospital is vicariously liable for Casey's negligence, it was not independently negligent for failing to supervise or train Casey.

88.  The Hospital had a comprehensive policy with respect to service animals and compliance with the ADA.  The policy expressly allowed service animals into the Hospital and required that the Hospital make reasonable accommodations in regards to service animals when necessary.

89.  The Hospital cannot be expected to include in its policy every regulation interpreting the ADA.  The regulation Casey violated was enacted in March 2011, approximately nine months prior to the incident.  Moreover, the Court is aware of no more than a handful of cases addressing that provision since it was enacted. The Hospital's failure to include this new and relatively obscure provision in its policy, and its failure to train its security officers regarding the same, does not constitute negligence.

**M.    Punitive Damages**

90.    Under California law, punitive damages are available in an action for "the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294(a).

91.  "Malice" means "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  Id. § 3294(c)(1).

92.  "Oppression" means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."  Id. § 3294(c)(2).

93.  "Fraud" means "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."  Id. § 3294(c)(3).

94.  Hurley has not provided credible evidence, much less clear and convincing evidence, that Casey acted with malice, oppression, or fraud in his interactions with Hurley.  As explained above, although Casey's questions did violate the law, Casey's other actions were reasonable under the circumstances, especially given Hurley's escalation of the situation through her inappropriate and disruptive behavior.

**N.   Declaratory Relief**

95.   Hurley requests a declaration that Defendants violated the ADA, Section 504 of the Rehabilitation Act, the Unruh Act, the California Disabled Persons Act, and the Bane Act.

96.   The Court, however, has already resolved this dispute in finding that Casey violated the ADA, Section 504 of the Rehabilitation Act, the Unruh Act, and the California Disabled Persons Act.[15]   Declaratory relief is therefore not warranted.   See Leu v. Int'l Boundary Comm'n, 605 F.3d 693, 694 (9th Cir. 2010) ("In the context of a declaratory judgment action, allegations of past injury alone are not sufficient to confer standing.") (citation and quotation marks omitted); Olenicoff v. UBS AG, No. SACV 08-1029 AG (RNBx), 2010 WL 8530286, at *34 (C.D. Cal. Mar. 16, 2010) ("Declaratory relief is not available to merely adjudicate past conduct or to establish liability."); Gafcon, Inc. v. Ponsor & Associates, 98 Cal. App. 4th 1388, 1404 (2002) ("Because declaratory relief operates prospectively only, rather than to redress past wrongs, [plaintiff]'s remedy as against [defendant] lies in pursuit of a fully matured cause of action for money . . . .")

97.   Any conclusion of law that constitutes a finding of fact should be treated as such.

### III.   CONCLUSION

98.   Defendants are jointly and severally liable to Plaintiff Jamie Hurley for damages in the amount of $4,000.

DATED: 2/12/14

_____
Dale S. Fischer
United States District Judge

---

[15]   As discussed above, Casey did not violate the Bane Act.  Moreover, although the Hospital is vicariously liable for Casey's actions, its ADA policy was not unreasonable.